# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| S3G TECHNOLOGY LLC, | Case No. 2:24-cv-126 |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| THE KROGER CO., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff S3G Technology LLC ("S3G") alleges as follows for its complaint against Defendant The Kroger Co. ("Defendant" or "Kroger"):

## JURISDICTION AND VENUE

1.      This is an action for patent infringement in violation of the Patent Act of the United States, 35 U.S.C. §§ 1 et seq.

2.      This Court has original and exclusive subject matter jurisdiction over patent infringement claims for relief under 28 U.S.C. §§ 1331 and 1338(a).

3.      The Court has specific and general personal jurisdiction over Kroger pursuant to due process and/or the Texas Long Arm Statute, due at least to Kroger's substantial business in this forum, including: (i) at least a portion of the infringements alleged herein; and (ii) regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas and in this District.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because, among other things, Defendant is subject to personal jurisdiction in this judicial district, Defendant

1

has a regular and established place of business, among others in this district, Defendant has purposely transacted business involving the use of the Accused Instrumentalities (defined below) in this judicial district, and committed acts of infringement in this judicial district as described herein.  For example, Defendant distributes the Accused Instrumentalities directly to customers, such as through the Apple App Store and Google Play.  Among other business, Defendant is in the business of providing mobile ordering using the Accused Instrumentalities in this District including at 300 E End Blvd N, Marshall, Texas, 75670.  Defendant puts its mobile ordering application in service within this District to allow users within this District to order from stores in this District in a manner alleged to infringe the asserted claims, as detailed herein. On information and belief, Defendant derives a significant portion of its revenue from the promotion, sale and distribution of its products and services in this District, including through the use of the Accused Instrumentalities.

## PARTIES

5.     S3G is a limited liability company organized under the laws of the State of California with its principal place of business in Foster City, California.  S3G has been, and continues to, develop technology-based solutions that facilitate economic empowerment and development.  For example, S3G is developing mobile solutions that enable the authenticated access to different types of spaces, including to buildings and portions thereof.  The information that S3G's technology solutions may collect and maintain about its users further enable the delivery of educational and other services that may help these users to emerge from poverty and change their lives and those of their families.  In connection with its mobile solutions, S3G has obtained patents covering its technology.  S3G is a Massachusetts Institute of Technology (MIT) Computer Science and Artificial Intelligence Lab (CSAIL) Startup, and is a member of MIT CSAIL Alliances' Startup Connect.

71981903v1

6.     The Managing Member of S3G, who is also the named inventor of the asserted patents, is an award-winning MIT-trained researcher, technologist and inventor who has used and continues to use innovative technologies to address many of the world's critical problems, including poverty, access to financial services and access to clean drinking water.  The World Economic Forum has recognized him for his professional accomplishments, commitment to society and potential to contribute to shaping the future of the world.

7.     On information and belief, Defendant Kroger is a corporation existing under the laws of the State of Ohio, with a regular and established place of business in this Judicial District at 300 E End Blvd N, Marshall, Texas, 75670.  On information and belief, Kroger offers for sale and sells products and services throughout Texas, including in this judicial district, and provides the Accused Instrumentalities that perform infringing methods or processes in this judicial district. S3G is further informed and believes, and on that basis alleges, that Defendant derives a significant portion of its revenue from the use, promotion, sale and distribution of its products and services, including through the use of Defendant's Kroger mobile applications for devices running the Android operating system[1] and Kroger mobile applications for iOS[2] (collectively, "Defendant app"), as well as its systems, methods, computing devices, including servers, software, and non-transitory computer readable storage medium that execute, run, store, support or facilitate the use of the Defendant app (collectively, "Accused Instrumentalities" or "Accused System").[3]

---

[1] KROGER, GOOGLE PLAY,
https://play.google.com/store/apps/details?id=com.kroger.mobile&hl=en_US&gl=US (last updated February 7, 2024).
[2] KROGER, APPLE: APP STORE, https://apps.apple.com/us/app/kroger/id403901186 (last updated February 6, 2024).
[3] The Accused Instrumentalities include, but are not limited to, the Smiths, Ralphs and Food 4 Less mobile applications because they have the same functionality described below with respect to the Kroger application. To the extent that other of Defendant's mobile applications also have the same accused functionality, they are included as part of the Accused Instrumentalities.

71981903v1

8.      S3G is informed and believes, and on that basis alleges, that, at all times relevant hereto, Defendant has conducted and continues to conduct business, including the use, distribution, promotion, and/or the offer for sale and sale of its products and services using the Accused Instrumentalities, including the Defendant app, in this Judicial District. On information and belief, Defendant does business itself, or through its subsidiaries, affiliates, and franchisees, in the State of Texas and the Eastern District of Texas.

## PATENTS

9.      United States Patent No. 9,081,897 (the "'897 patent") entitled "Modification of Terminal and Service Provider Machines Using an Update Server Machine" was duly and legally issued on July 14, 2015.  A true and correct copy of the '897 patent is attached hereto as Exhibit "A" and incorporated herein by this reference.  By assignment, S3G is now the assignee of the entire right, title and interest in and to the '897 patent, including all rights to enforce the '897 patent and to recover for infringement.  The '897 patent is valid and in force.

10.      United States Patent No. 9,940,124 (the "'124 patent") entitled "Modification of Terminal and Service Provider Machines Using an Update Server Machine" was duly and legally issued on April 10, 2018.  A true and correct copy of the '124 patent is attached hereto as Exhibit "B" and incorporated herein by this reference.  S3G is the owner of the entire right, title and interest in and to the '124 patent, including all rights to enforce the '124 patent and to recover for infringement.  The '124 patent is valid and in force.

11.      United States Patent No. 9,304,758 (the "'758 patent") entitled "Modification of Terminal and Service Provider Machines Using an Update Server Machine" was duly and legally issued on April 5, 2016.  A true and correct copy of the '758 patent is attached hereto as Exhibit "C" and incorporated herein by this reference.  S3G is the assignee of the entire right, title and

71981903v1

interest in and to the '758 patent, including all rights to enforce the '758 patent and to recover for infringement.  The '758 patent is valid and in force.

**The Technical Problems Addressed by the Patents-in-Suit**

12.    The '897, 124, and '758 patents (collectively, the "Asserted Patents") disclose that at the time of the invention, often times, after a computerized system has been initially constructed, modifications may be required, either to improve the functionality of the system or to customize the system to meet new requirements.  Typically, a software application includes computer-executable instructions that are not able to be edited or modified directly by a developer.  Instead, the developer may make the required changes by either creating or editing original source code.  Once edited or modified, the updated source code must then be recompiled or translated into an updated set of computer-executable instructions.  These updated set of computer-executable instructions often includes a relatively large amount of information, which must then be distributed to the hardware devices in the system as an updated software application.  '124 Patent, Col. 2:12-28.[4]

13.    At the time of the invention, in many situations it may be difficult to distribute a newly compiled version of the updated software application to all of the devices in the system. This is particularly true if the system is distributed over a large geographic area making it difficult to locate each system device and transport it to a central location where the newly updated computer-executable instructions can be uploaded.  This lack of physical access to the devices often means that the new software application cannot be uploaded using a traditional wired connection (*e.g.*, an interface cable).  Col. 2:29-38.

---

[4] Unless otherwise indicated, all citations are to the '124 patent.

5

14.     The Asserted Patents further explain that using a wireless communications network to upload the updated computer-executable instructions also has several significant drawbacks. First, the size of the updated computer-executable instructions may exceed the transmission capabilities of the communications network, *i.e.*, the size of the file is too large to be uploaded. Second, even if the updated computer-executable instructions can be uploaded and transmitted over the wireless network, it may take an excessive amount of time.  Third, these problems are exacerbated if (1) the computer system includes a large number of devices that must be updated with the modified computer-executable instructions and (2) the devices contain different versions of the application or multiple applications need updates.  Col. 2:39-64.

## The Claimed Solution to the Technical Problems

15.     The Asserted Patents are directed to a technological specific solution, *i.e.*, improving the way computers operate.  In particular, the Asserted Patents claim a specific computerized system in order to implement systems and methods of providing efficient modification of a specific type of software applications that are distributed across a network of remote devices.  Col. 2:65-67.  As an example, FIG. 1 (below) discloses, and the Asserted Patents claim, a unique and very specific type of computer system structure involving three entities: a service provider machine 110, a terminal machine 120 and an update server machine 102.  Within this specific system, a terminal machine 120 and a service provider machine 110 communicate via applications running on the machines (as depicted by the vertical arrows in the figure).

 

16.    As shown below in FIG. 2, the applications running on these machines have a very specific structure: namely, the terminal application 122 comprises first computer-executable instructions 224, which has been construed to mean "computer instructions that can be directly executed on a processor,"[5] and first code 222.  Col. 7:56-61.  The Asserted Patents expressly define that "code" is not just any generic software code; instead, the Asserted Patents teach a very specific structure for "code," clearly stating that "[t]he code represents at least some information that ***must be translated*** by the software application before it can be implemented on the machine processor."  Col. 4:30-40 (emphasis added).[6] The terminal application conducts the terminal machine's portion of the dialogue with the service provider machine.

---

[5] *See S3G Tech. LLC v. Unikey Techs.*, *Inc.*, No. 6:16-cv-400-RWS-KNM, 2017 WL 5178838, at *3 (E.D. Tex. July 7) (attached hereto as Exhibit D), *adopted in* 2017 WL 4968642, at *1-2 (Nov. 1, 2017) (attached hereto as Exhibit E).
[6] Consistent with the specification, the term "code" has been construed to mean "information that must be translated before it can be executed on a processor."  *See* Exhibit D at Appendix A.

17.     In like fashion, as shown in FIG. 2, the service provider machine runs an application having a very specific structure: namely, the provider application 112 comprises second computer-executable instructions 214, which can be directly executed on a processor, and second code 212, which must be translated before it can be executed on a processor.   The provider application conducts the service provider's portion of the dialogue with the terminal machine.

18.     FIGS. 1 and 2 also show that the computer system structure in the Asserted Patents is unique in having a third entity, an update server machine.   The update server machine is able to communicate with both the terminal machine and the service provider machine (as depicted by the diagonal arrows in the FIG. 1).   The update server machine also has a unique and very specific data structure for communicating with the terminal and service provider machines: namely, the update server machine sends one or more dialogue modules, which has been construed to mean "code or instructions related to a dialogue sequence."[7]

19.     As part of the dialogue between the terminal machine and the service provider machine, the terminal machine is modified by receiving a terminal dialogue module.   As noted, the dialogue module is a specific structure that contains information that must be translated by the software application before it can be implemented on the machine processor.   After receiving the dialogue module, specific actions can be taken.   For example, the dialogue module may replace existing terminal code already saved on the terminal machine or the terminal code may supplement other code previously saved on the terminal machine.   Col. 8:63-9:3.   These steps produce first updated code, which adapts the terminal application to display a further prompt for the terminal machine's portion of a modified dialogue sequence with the service provider machine. Significantly, when terminal and service provider applications are modified using a dialogue

---

[7] *Id.*

module it does not result in replacing the prior applications with entirely new applications. This is important because this system with its specific structures results in a number of technological benefits: namely, computing resource, improved network utilization, and design efficiencies. Col. 6:61-63; 14:66-15:6; FIGS. 8A-8B.

20.    During litigation of the Asserted Patents, parties and a Court construing terms of the claimed inventions also held that the "dialogue module" is a very specific type of structure:

> The recital [in the claims] of "sending a . . . dialogue module" demonstrates that the claim uses the term "module"' to refer to *a particular type of structure rather than to any structure for performing a function*. Further, the specification is consistent with such an interpretation by disclosing that a "dialogue module" can contain code or other data and can be communicated….

Exhibit D, *S3G Tech. LLC v. Unikey Techs., Inc.*, No. 6:16-cv-400-RWS-KNM, 2017 WL 5178838, at *12 (emphasis added).

21.    The Court also held that the claimed three entity system of the Asserted Patents also is a particular structure. Specifically, this Court stated that "the surrounding claim language [of terminal machine] provides details regarding how the terminal machine interacts with other components . . . in a way that . . . inform[s] the structural character of [it] or otherwise impart[s] structure." *Id*. at 23. The Court held that "[s]ubstantially the same analysis" applies to service provider and update server machines. *Id.* at 26, 29.

22.    Among other features, the Asserted Patents thus claim an unconventional and inventive solution to the problem of transmitting large executable files required to replace applications running on remote devices, which previously required networks having massive bandwidth. Specifically, the Asserted Patent disclose the unconventional and inventive system and method of transmitting dialogue modules to terminal and service provider machines to modify and/or update software applications running on those machines. The software applications also are unconventional and inventive in utilizing both computer-executable instructions, which can be

directly executed on a processor, and code, which must be translated before it can be executed on a processor, to solve this technological problem.

23.    In sum, as explained above, the features, and their arrangement, are unconventional and include: (1) the specific hardware structures (*i.e.*, terminal machine, service provider machine, update server machine); (2) use of specialized application software structures (*i.e.*, terminal application, service provider application) consisting of both computer executable instructions (that can run directly on a processor) and code (which first must be translated to be run on a processor); (3) arrangement whereby the terminal machine and service provider machine form a remote distributed system through specialized communications and protocols between them (*i.e.*, dialogue); (4) use of a specialized data structure (*i.e.*, dialogue module) also consisting of both code and instructions to modify the identically-structured software applications; and (5) modification of the software applications using the dialogue modules without modifying the computer executable instructions of the software applications.

24.    The use of "dialogue modules" containing "code" also results in various technical benefits. For example, as the Asserted Patents explain, transmitting an entire software application may represent a "large amount of information" that may not be feasible to transmit due to bandwidth limitations on data transfer over the network. Col. 2:39-44. And, even if an upload of the entire modified application is possible, it may take an unacceptable amount of time due to the slow transfer rate of a wireless network." Col. 2:50-56. By comparison, the Asserted Patents disclose that, "[i]n a preferred embodiment, the dialogue module is less than 1 Mb to facilitate communication over a network with limited data transfer capacity." Col. 6:61-63. Therefore, the use of the "dialogue modules" reduces network bandwidth utilization, thereby allowing efficient modification of applications running on remote devices on a network. Another benefit of using

"dialogue modules" is that it enables the use of design tools that facilitate their development and modification.  Col. 14:66-15:6, FIGS. 8A-8B.  These tools thus enable and improve the efficiency of modifying applications.

25.     As the CEO of a licensed defendant recently stated, S3G's patent portfolio is "impressive" and "covers critical distributed computing technologies, including highly-efficient network communications between mobile devices and servers."  Another licensed defendant agreed to license S3G's patent portfolio, in part, because of the "high burden of proving invalidity of any of S3G's patents."

26.     During the prosecution of the Asserted Patents or related patents, the United States Patent Examiner determined, as a factual matter, that, among other things, the claimed inventions were distinguishable from known systems and methods in that the unique structure described and claimed in the Asserted Patents was not known and would not have been obvious to those skilled in the art at the time of the inventions:

> As Applicants pointed out in the Remarks, **the prior art of record do not disclose and/or fairly suggest at least claimed limitations recited** in such manners in independent claim 1 " ... an update server machine comprising a processor and operable for sending a terminal dialogue module to the terminal machine and a provider dialogue module to the service provider machine to allow the terminal machine and the service provider machine to conduct a dialogue sequence with each other []....wherein the **terminal application comprises a first set of computer-executable instructions and a first set of code, wherein the first set of computer-executable instructions are able to execute directly on a terminal processor of the terminal machine, and wherein the first set of code is not able to execute directly on the terminal processor**; ... wherein the first set of updated code adapts the terminal application to use a second sequence of prompts and a second sequence of data entries for the terminal machine's portion of a modified dialogue sequence with the service provider machine...These **claimed limitations are not present in the prior art of record and would not have been obvious**, thus all pending claims are allowed.

Exhibit F ['571 FH, Notice of Allowability, dated July 11, 2013, at Examiner's Statement of Reasons for Allowance] (emphasis added).

71981903v1

27.     For example, U.S. Examiners have distinguished the claimed inventions over virtual machines, examples of which have been submitted to the Patent Office during the prosecution of S3G's patents in the form of subject matter eligibility contentions, and the claims were allowed over such contentions under 35 U.S.C. § 101. *See e.g.,* U.S. Patent Nos. 11,210,082 and 11,662,995.

## FIRST CLAIM FOR RELIEF

### Infringement of the '897 patent

28.     S3G refers to and incorporates herein by reference the preceding paragraphs.

29.     Defendant, by the acts complained of herein, and by making, using, selling, offering for sale, and/or importing in the United States, including in the Eastern District of Texas, instrumentalities embodying the invention, has in the past, does now, and continues to infringe the '897 patent directly, contributorily, and/or by inducement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.

30.     At least since the filing of this complaint, Defendant has had actual knowledge of the '897 patent.

31.     On information and belief, Defendant has directly infringed one or more claims of the '897 patent by making, using, importing, supplying, selling, or offering for sale the Accused Instrumentalities. By doing so, Defendant has directly infringed at least claim 1 of the '897 patent.

32.     Defendant provides a system for modifying one or more terminal machines and one or more service provider machines ("Accused System").

33.     The Accused System includes one or more update server machines (e.g., a smart phone or other computing device accessing the Defendant system, e.g., accessing the Defendant website) comprising a processor and operable for sending a terminal dialogue module (e.g.,

terminal machine portion of a shopping list item[8]) to a respective terminal machine (e.g., an Android smart phone or other Android computing device running the Defendant app) and a provider dialogue module (e.g., service provider machine portion of a shopping list item to a respective service provider machine (e.g., Defendant server) to allow the terminal machine and the service provider machine to conduct a dialogue sequence (e.g., series of prompts and corresponding user data entries) with each other. The Accused System includes an update server machine (e.g., a smart phone or other computing device accessing the Defendant system or, alternatively, Defendant server) comprising a processor. One of ordinary skill would understand that smart phones or other computing devices necessarily comprise a processor, e.g., to run the operating system, applications, etc. The Accused System includes an update server machine (e.g., a smart phone or other computing device accessing the Defendant system) that is operable for sending a terminal dialogue module (e.g., terminal machine portion of a shopping list item) to the terminal machine (e.g., an Android smart phone or other Android computing device running the Defendant app). The Accused System can be accessed from any device, including PC, Android and iOS tablets, and Android and iOS phones. Therefore, these and other devices that can access the Accused System constitute update server machine, which is a computing device capable of sending one or more dialogue modules. For example, without limitation, a dialogue module is sent from a user's device accessing the Accused System to the Defendant server. The Defendant server then sends information to a user's Defendant app on a terminal machine. On information and belief, the format of the information that is sent from the Defendant server to the Defendant app is, for example, JSON. The Accused System includes an update server machine (e.g., a smart

---

[8] The analysis herein applies equally to other aspects of the Accused System, including, but not limited to, My Lists, including creating new lists, Rewards, Order Ahead, My Account, Purchase History, Profile, Address Book, Wallet, Past Purchases, and Cart.

phone or other computing device accessing the Accused System) that is operable for sending a provider dialogue module (e.g., service provider machine portion of a shopping list item) to the service provider machine (e.g., Defendant server).  This is done using, for example, HTTP.  For example, without limitation, after receiving the respective dialogue module users can view shopping list items. For example, without limitation, after receiving a respective dialogue module, a user will be prompted with one or more shopping list items to, for example, review, order, or delete the shopping list item.  In response to these prompts, the user selects the appropriate data entry (e.g., button).  Thereafter, the user is provided with additional prompts.

34.     The Accused System includes a terminal machine (*e.g.,* an Android smart phone or other Android computing device running the Defendant app) that is configured to run a terminal application (*e.g.,* Defendant app for Android) that conducts the terminal machine's portion of the dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) with the service provider machine (*e.g.,* Defendant server), wherein the terminal application comprises a first set of computer executable instructions and a first set of code, wherein the first set of computer-executable instructions are able to execute directly on a terminal processor of the terminal machine, and wherein the first set of code is not able to execute directly on the terminal processor.  The terminal application conducts the terminal machine's portion of the dialogue sequence with the service provider machine because, for example, without limitation, using the Defendant app running on an Android smart phone or other Android computing device, a user is able to review, delete and order from based on a shopping list item.  The user is prompted to review, order or delete from based on the shopping list item, *e.g.*, by ordering items.  This information is necessarily communicated to the Defendant server because, for example, without limitation, it must be communicated in order to order the item.  The terminal application is operable for displaying a

prompt in a first sequence of prompts and accepting a user data entry in an associated first sequence of user data entries as explained herein, including above. The Accused System includes a terminal application (*e.g.*, Defendant app for Android), and one of ordinary skill would understand that the Defendant app for Android comprises a first set of computer executable instructions and a first set of code, wherein the first set of computer-executable instructions are able to execute directly on a terminal processor of the terminal machine, and wherein the first set of code is not able to execute directly on the terminal processor. For example, without limitation, the Android Runtime (ART) comprises computer executable instructions that are able to execute directly on a terminal processor, while the app's bytecode is not able to execute directly on the terminal processor.

35. The Accused System includes a service provider machine (*e.g.,* Defendant server) that is configured to run a provider application (*e.g.,* Defendant server application) that conducts the service provider machine's portion of the dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) with the terminal machine, wherein the provider application comprises a second set of computer-executable instructions and a second set of code, wherein the second set of computer-executable instructions are able to execute directly on a provider processor of the service provider machine, and wherein the second set of code is not able to execute directly on the provider processor. The Accused System includes a provider application (*e.g.,* Defendant server application, which, upon information and belief, is a .Net application), and one of ordinary skill would understand that the Defendant server application comprises a second set of computer-executable instructions and a second set of code, wherein the second set of computer-executable instructions are able to execute directly on a provider processor of the service provider machine, and wherein the second set of code is not able to execute directly on the provider processor. For example, without limitation, the execution environment of .Net, including the Common Language

15

Runtime (CLR) that manages the execution of .NET programs, virtual machine, operating system, libraries, compiled .Net programs, or portions thereof, comprise computer-executable instructions which are able to execute directly on a provider processor, while the .Net program is not able to execute directly on the provider processor.

36.     In the Accused System, the terminal dialogue module (*e.g.,* terminal machine portion of a shopping list item) modifies the first set of code to produce a first set of updated code, wherein the provider dialogue module (*e.g.,* service provider machine portion of a shopping list item) modifies the second set of code to produce a second set of updated code, wherein the terminal dialogue module does not modify the first set of computer-executable instructions and wherein the provider dialogue module does not modify the second set of computer-executable instructions, wherein the first set of updated code adapts the terminal application to use a modified dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) with the service provider machine, and wherein the second set of updated code adapts the provider application to use the modified dialogue sequence with the terminal machine.  As explained above, when a user inputs a shopping list item using the Defendant system, information is communicated to the user's Defendant app (terminal application on the terminal machine).  As also explained above, without limitation, the dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) is evidenced in the one or more items in the shopping list item. In response, the user selects the appropriate data entry (*e.g.*, button).  Additional prompts include reviewing, deleting and ordering from based on a shopping list item.  At least a portion of the information is necessarily stored on the terminal machine because, for example, without limitation, the shopping list item appears on the user's Android device and allows the user to select it even at a later time.  Therefore, the provider dialogue module modifies the second set of code to produce a second set of updated code.

The first set of updated code adapts the terminal application to use a second sequence of prompts and a second sequence of data entries for the terminal machine's portion of a modified dialogue sequence with the service provider machine.  For example, without limitation, as previously explained herein, a second sequence of prompts and a second sequence of data entries is demonstrated when new items are added to the shopping list, and they appear on the user's Android device.  This necessarily represents a modified dialogue sequence with the service provider machine.  In the Accused System, the provider dialogue module (*e.g.,* service provider machine portion of a shopping list item) modifies the second set of code to produce a second set of updated code wherein the second set of updated code adapts the provider application to use a second sequence of prompts and a second sequence of data entries for the service provider machine's portion of the modified dialogue sequence with the terminal machine.  As discussed herein, when a user inputs a shopping list item using their device (*e.g.*, PC or mobile device), information is communicated to the Defendant server application (provider application on the service provider machine).  As also explained herein, the dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) is evidenced in the one or more items in the shopping list and the corresponding user data entry of selecting the appropriate shopping list item (*e.g.*, button).  Additional prompts include deleting, reviewing and ordering from based on the shopping list item.  At least a portion of the information is necessarily stored on the provider machine because, for example, without limitation, the shopping list item information is available on the Defendant server as well as on different devices, including at a later time.  Therefore, the provider dialogue module modifies the second set of code to produce a second set of updated code.  The second set of updated code adapts the provider application to use the second sequence of prompts and the second sequence of data entries for the service provider machine's portion of the modified dialogue

17

sequence with the terminal machine.  For example, without limitation, as previously explained herein, a second sequence of prompts and a second sequence of data entries is demonstrated when new shopping list items are added, and they appear on the user's Android device.  In the accused system, the terminal dialogue module (*e.g.,* terminal machine portion of a shopping list item) does not modify the first set of computer-executable instructions, as is readily understood by one of ordinary skill.  For example, without limitation, as previously explained herein, ART comprises the first set of computer-executable instructions and is not modified by the terminal dialogue module.  In the Accused System, the provider dialogue module (*e.g.,* service provider machine portion of a shopping list item) does not modify the second set of computer-executable instructions, as is readily understood by one of ordinary skill.  For example, without limitation, as already explained herein, the execution environment of .Net, including the Common Language Runtime (CLR) that manages the execution of .NET programs, virtual machine, operating system, libraries, compiled .Net programs, or portions thereof, comprise the second set of computer-executable instructions and is not modified by the provider dialogue module.

37.     On information and belief, Defendant manufactures, or contracts with vendors and others to manufacture, uses and distributes the Accused System, including the accused software applications running on the mobile devices and servers.  Within this jurisdiction and elsewhere, Defendant and its employees, agents and affiliates use the Accused System in connection with its design, development, testing and maintenance of the Accused System as well as in connection the use of the Accused System by its employees, agents, affiliates, and customers.

38.     On information and belief, Defendant further provides and distributes, or contracts with others to provide and distribute, the Defendant app of the Accused System, including the accused mobile applications.  Customers and/or end users download the Defendant app in

accordance with Defendant's provided instructions.  As set forth above, the Defendant app interacts with Defendant's servers by communicating with and giving and/or receiving instructions, data, and other information to and from Defendant's servers.

39.    To the extent that some elements or steps of a claim in the '897 patent are performed or provided by a different party than Defendant, those elements or steps are attributable to the Defendant because Defendant participates in the infringement (as described above and herein) and receives a benefit upon use and performance of the claimed systems and methods of the '897 patent.  In particular, Defendant provides the software that establishes the manner and/or timing of the performance of the use of Defendant's software and thus directs and controls the actions that a user may request or the results from a user's actions.  Defendant receives a benefit from such actions by the customer as it allows the customer to shop and purchase Defendant's products from Defendant and Defendant's customers receive a benefit in that they are able to shop and purchase Defendant's products remotely using their own devices.  Defendant's contracts with a user also create an agency relationship or governs infringing activity for purposes of joint infringement.

40.    On information and belief, Defendant instructs its customers and end users to download and install on end users' devices the infringing software applications, including updates, in order to use the claimed systems and practice the claimed methods of the '897 patent.  On information and belief, in accordance with Defendant's instructions, Defendant's customers and other end users use the Accused System in a way that practice the claimed methods of the '897 patent as set forth above.  The Defendant app issues computerized instructions to direct or control users, including Defendant's customers and other end users, in the manner or timing of their use of their devices and the Defendant app.  Through its software on Defendant's servers and

embedded on users' devices, as well as its contractual relationships with users, Defendant thus directs and controls users and their devices to perform acts of infringement alleged above.

41.     On information and belief, Defendant enters into agreements with customers and/or end users and others and conditions their use of Defendant's infringing software and its functionality, including but not limited to the Defendant app, upon consent with Defendant's Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

42.     On information and belief, at least since the filing of this Complaint, Defendant has knowingly and actively induced the infringement of one or more of the '897 patent claims by, *inter alia*, marketing, promoting, and offering for use the Accused Instrumentalities, knowingly and intending that the use of such instrumentalities by Defendant customers and by users infringes the '897 patent.  For example, Defendant intends to induce such infringement by, among other things, promoting users to download and run the Defendant app knowing that the use of its applications on a user's portable device or smart phone in connection with supporting systems such as its server(s) infringes one or more claims of the '897 patent.

43.     On information and belief, at least since the filing of this Complaint, Defendant has contributed to the infringement of the '897 patent by, *inter alia*, marketing and promoting products and services.  Defendant has used and promoted within the United States the Accused Instrumentalities.  By virtue of incorporating the patented technology described above, the Accused Instrumentalities are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted to the infringe the '897 patent.  As a result, Defendant's Accused Instrumentalities have been used by its customers and by users to infringe the '897 patent.  Defendant continues to engage in acts of contributory infringement of the '897 patent.

44.    By reason of the acts of Defendant alleged herein, S3G has suffered damage in an amount to be proved at trial.

45.    Defendant threatens to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to S3G's irreparable injury.  It would be difficult to ascertain the amount of compensation that would afford S3G adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required.  S3G does not have an adequate remedy at law to compensate it for the injuries threatened.

## SECOND CLAIM FOR RELIEF

### Infringement of the '124 patent

46.    S3G refers to and incorporates herein by reference the preceding paragraphs.

47.    Defendant, by the acts complained of herein, and by making, using, selling, offering for sale, and/or importing in the United States, including in the Eastern District of Texas, instrumentalities embodying the invention, has in the past, does now, and continues to infringe the '124 patent directly, contributorily, and/or by inducement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.

48.    At least since the filing of the original complaint, Defendant has had actual knowledge of the '124 patent.

49.    On information and belief, Defendant has directly infringed one or more claims of the '124 patent by making, using, importing, supplying, selling, or offering for sale the Accused Instrumentalities.  By doing so, Defendant has directly infringed at least claim 1 of the '124 patent.

50.    The Accused System performs a method of conducting a dialogue between a terminal machine and a service provider machine.

51.    The Accused System performs a method comprising displaying a first prompt on a terminal display of a terminal machine (*e.g.,* an Android smart phone or other Android computing

device running the Defendant app) by running a terminal application (*e.g.,* Defendant app for Android), the terminal application comprising first computer-executable instructions and first code (e.g., Android Runtime and Defendant app's bytecode, respectively) that conduct the terminal machine's portion of the dialogue. When conducting a dialogue, the terminal application displays a first prompt and accepts a first data entry at the terminal machine, wherein the first data entry is associated with the first prompt. For example, without limitation, using the Defendant app, a user is able to create or review shopping list item (list) information and edit it. The user is prompted with one or more shopping list item (list) to, for example, place an order from the shopping list item (list). The user is also able to edit and delete shopping list item (list). This information is necessarily communicated to the service provider machine (e.g., Defendant's server) because, for example, without limitation, it must be stored and available to the user in the future. One of ordinary skill would understand that the terminal application (*e.g.*, Defendant app for Android) comprises first computer executable instructions and first code. As noted, for example, without limitation, the Android Runtime (ART) comprises computer executable instructions, while the app's bytecode comprises code.

52.     As explained above, the Accused System performs a method comprising accepting a first data entry at the terminal machine (*e.g.,* an Android smart phone or other Android computing device running the Defendant app), wherein the first data entry is associated with the first prompt.

53.     The Accused System performs a method comprising communicating information associated with the first data entry from the terminal machine (*e.g.,* an Android smart phone or other Android computing device running the Defendant app) to the service provider machine (*e.g.,* Defendant server), wherein the service provider machine (*e.g.,* Defendant server) uses a provider application (*e.g.,* Defendant server application) comprising second computer-executable

instructions and second code that conduct the service provider machine's portion of the dialogue, and wherein the provider application is capable of sending an authorization code to the terminal machine.  In the Accused System, information associated with the first data entry is communicated from the terminal machine to the service provider machine.  For example, without limitation, using the Defendant app, a user is able to review shopping list item (list) and place orders.  This information is necessarily communicated to the Defendant server because, for example, without limitation, otherwise it would not be ordered. Additionally, a shopping list item (list) can be deleted. This information is necessarily communicated to the Defendant server because, for example, without limitation, it must not show in the shopping list item (list) in the future.  The provider application (*e.g.,* Defendant server application, which, upon information and belief, is a .Net application) runs on the service provider machine (*e.g.,* Defendant server), and one of ordinary skill would understand that the Defendant server application comprises second computer-executable instructions and second code.   For example, without limitation, the execution environment of .Net, including the Common Language Runtime (CLR) that manages the execution of .NET programs, virtual machine, operating system, libraries, compiled .Net programs, or portions thereof, comprise computer-executable instructions, while the .Net program comprises code.  In the Accused System, the provider application is capable of sending an authorization code to the terminal machine, for example, without limitation, by authorizing logging into the Accused System.

54.     The Accused System performs a method storing at least a portion of the information associated with the first data entry in memory for analysis.  For example, the service provider machine stores for analysis at least a portion of the information associated with the first data entry, e.g., an order of a shopping list item (list), so that these orders may be analyzed and the appropriate

rewards can be made available on the Accused System.  If at least a portion of the information was not stored in memory, the order history would not be available to the user.  Additionally, coupons are available to users.

55.     The Accused System performs a method comprising receiving, at the terminal machine (*e.g.,* an Android smart phone or other Android computing device running the Defendant app), a terminal dialogue module (*e.g.,* terminal machine portion of a dialogue (e.g., shopping list item (list))) that updates at least a portion of the first code to produce first updated code, wherein the first updated code adapts the terminal application (*e.g.,* Defendant app for Android) to display a second prompt for the terminal machine's portion of a modified dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) with the service provider machine, wherein at least one of the first code, the second code, and the first updated code comprise intermediate code. For example, without limitation, when a user inputs a shopping list item (list) using the Accused System, information is communicated to the user's Defendant app (e.g., terminal application on the terminal machine).  The format of the information that is sent from the Defendant server to the user's Defendant app is, for example, JSON.  At least a portion of the information is necessarily stored on the terminal machine because, for example, without limitation, the shopping list item (list) appears on the user's Android device and allows the user to select it even at a later time. Therefore, the terminal dialogue module updates at least a portion of the first code to produce first updated code.  The dialogue sequence (*e.g.*, series of prompts and corresponding user data entries) is evidenced in the one or more shopping list item (list) and the corresponding user data entry of selecting a desired shopping list item (list) (*e.g.*, button).  Additional prompts include reviewing shopping list item (list) information and editing and deleting shopping list item (list).  For example, without limitation, the second prompt is evidenced by the ability to access *new* a shopping list item

(list).   At least one of the first code, the second code, and the first updated code comprise intermediate code.   As explained above, the terminal application is identified as, for example, without limitation, the Defendant app for Android, and the first code and the first updated code is identified as, for example, without limitation, the app's bytecode.

56.    On information and belief, Defendant manufactures, or contracts with vendors and others to manufacture, uses and distributes the Accused System, including the accused software applications running on the mobile devices and servers.   Within this jurisdiction and elsewhere, Defendant and its employees, agents and affiliates use the Accused System in connection with its design, development, testing and maintenance of the Accused System as well as in connection the use of the Accused System by its employees, agents, affiliates, and customers.

57.    On information and belief, Defendant further provides and distributes, or contracts with others to provide and distribute, the Defendant app of the Accused System, including the accused mobile applications.   Customers and/or end users download the Defendant app in accordance with Defendant's provided instructions.   As set forth above, the Defendant app interacts with Defendant's servers by communicating with and giving and/or receiving instructions, data, and other information to and from Defendant's servers.

58.    To the extent that some elements or steps of a claim in the '124 patent are performed or provided by a different party than Defendant, those elements or steps are attributable to the Defendant because Defendant participates in the infringement (as described above and herein) and receives a benefit upon use and performance of the claimed systems and methods of the '124 patent.   In particular, Defendant provides the software that establishes the manner and/or timing of the performance of the use of Defendant's software and thus directs and controls the actions that a user may request or the results from a user's actions.   Defendant receives a benefit from such

actions by the customer as it allows the customer to shop and purchase Defendant's products from Defendant and Defendant's customers receive a benefit in that they are able to shop and purchase Defendant's products remotely using their own devices.  Defendant's contracts with a user also create an agency relationship or governs infringing activity for purposes of joint infringement.

59.     On information and belief, Defendant instructs its customers and end users to download and install on end users' devices the infringing software applications, including updates, in order to use the claimed systems and practice the claimed methods of the '124 patent.  On information and belief, in accordance with Defendant's instructions, Defendant's customers and other end users use the Accused System in a way that practice the claimed methods of the '124 patent as set forth above.  The Defendant app issues computerized instructions to direct or control users, including Defendant's customers and other end users, in the manner or timing of their use of their devices and the Defendant app.  Through its software on Defendant's servers and embedded on users' devices, as well as its contractual relationships with users, Defendant thus directs and controls users and their devices to perform acts of infringement alleged above.

60.     On information and belief, Defendant enters into agreements with customers and/or end users and others and conditions their use of Defendant's infringing software and its functionality, including but not limited to the Defendant app, upon consent with Defendant's Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

61.     On information and belief, at least since the filing of the original complaint, Defendant has knowingly and actively induced the infringement of one or more of the '124 patent claims by, *inter alia*, marketing, promoting, and offering for use the Accused Instrumentalities, knowingly and intending that the use of such instrumentalities by Defendant customers and by users infringes the '124 patent.  For example, Defendant intends to induce such infringement by,

among other things, promoting users to download and run its mobile applications, including the applications for devices running the Android operating system, knowing that the use of the applications on a user's portable device or smart phone in connection with supporting systems such as its server(s) infringes one or more claims of the '124 patent.

62.     On information and belief, at least since the filing of this Complaint, Defendant has contributed to the infringement of the '124 patent by, *inter alia*, marketing and promoting products and services.   Defendant has used and promoted within the United States the Accused Instrumentalities.   By virtue of incorporating the patented technology described above, the Accused Instrumentalities are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted to the infringe the '124 patent.  As a result, Defendant's Accused Instrumentalities have been used by its customers and by users to infringe the '124 patent.  Defendant continues to engage in acts of contributory infringement of the '124 patent.

63.     By reason of the acts of Defendant alleged herein, S3G has suffered damage in an amount to be proved at trial.

64.     Defendant threatens to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to S3G's irreparable injury.  It would be difficult to ascertain the amount of compensation that would afford S3G adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required.  S3G does not have an adequate remedy at law to compensate it for the injuries threatened.

## THIRD CLAIM FOR RELIEF

### Infringement of the '758 patent

65.     S3G refers to and incorporates herein by reference the preceding paragraphs.

66.     Defendant, by the acts complained of herein, and by making, using, selling, offering for sale, and/or importing in the United States, including in the Eastern District of Texas, instrumentalities embodying the invention, has in the past, does now, and continues to infringe the '758 patent contributorily and/or by inducement, literally and/or under the doctrine of equivalents, in violation of 35 U.S.C. § 271.

67.     At least since the filing of the original complaint, Defendant has had actual knowledge of the '758 patent.

68.     On information and belief, Defendant has directly infringed one or more claims of the '758 patent by making, using, importing, supplying, selling, or offering for sale the Accused Instrumentalities.  By doing so, Defendant has directly infringed at least claim 1 of the '758 patent.

69.     The Accused System performs a method of conducting a dialogue between a terminal machine and a service provider machine.

70.     The Accused System performs a method comprising displaying a first prompt on a terminal display of a terminal machine (*e.g.,* an Android smart phone or other Android computing device running the Defendant app) by running a terminal application (*e.g.,* Defendant app for Android), the terminal application comprising first computer-executable instructions and first code that conduct the terminal machine's portion of the dialogue.  The terminal application displays a first prompt and accepts a first data entry at the terminal machine, wherein the first data entry is associated with the first prompt.  For example, without limitation, using the Defendant app, a user is able to access shopping list item (list), and the user is prompted to review shopping list item (list) results.  Additionally, a user is prompted to edit and delete shopping list items (list).  This information is necessarily communicated to the Defendant server because, for example, without limitation, it must be stored and available to the user in the future.  One of ordinary skill would

28

understand that the terminal application (*e.g.*, Defendant app for Android) comprises first computer executable instructions and first code.  For example, without limitation, the Android Runtime (ART) comprises computer executable instructions, while the app's bytecode comprises code.

71.    As explained above, the Accused System performs a method comprising accepting a first data entry at the terminal machine (e.g., an Android smart phone or other Android computing device running the Defendant app), wherein the first data entry is associated with the first prompt.

72.    The Accused System performs a method comprising communicating information from the terminal machine (e.g., an Android smart phone or other Android computing device running the Defendant app) to the service provider machine (e.g., Defendant server), the information associated with the first data entry, the service provider machine (e.g., Defendant server) using a provider application (e.g., Defendant server application), the provider application comprising second computer-executable instructions and second code that conduct the service provider machine's portion of the dialogue.  In the Accused System, information from the terminal machine is communicated to the service provider machine, the information associated with the first data entry.  For example, without limitation, using the Defendant app, a user is able to select, delete or edit a shopping list item (list).  This information is necessarily communicated to the Defendant server because, for example, without limitation, it must be stored and available to the user in the future.  The provider application (e.g., Defendant server application, which, upon information and belief, is, for example, a .Net program) runs on the service provider machine (e.g., Defendant server), and one of ordinary skill would understand that the Defendant server application comprises second computer-executable instructions and second code.  For example,

29

without limitation, the CLR engine that manages the execution of the .Net program comprises computer-executable instructions, while the .Net program comprises code.

73.    The Accused System performs a method comprising receiving, at the terminal machine (e.g., an Android smart phone or other Android computing device running the Defendant app), a terminal dialogue module (e.g., terminal machine portion of a shopping list item (list)) that replaces at least a portion of the first code to produce first updated code, wherein the first updated code adapts the terminal application (e.g., Defendant app for Android) to display a second prompt for the terminal machine's portion of a modified dialogue sequence (e.g., series of prompts and corresponding user data entries) with the service provider machine, wherein at least one of the first code, second code, and first updated code comprise Java Byte code.  For example, when a user inputs a shopping list item (list) using the Accused System, information is communicated to the Defendant app (terminal application on the terminal machine).  The format of the information that is sent from the Defendant server to the Defendant app is, based on information and belief, for example, JSON.  At least a portion of the information is necessarily stored on the terminal machine because, for example, without limitation, the shopping list item (list) appears on the user's Android device and allows the user to select it even at a later time.  Therefore, the terminal dialogue module replaces at least a portion of the first code to produce first updated code.  The terminal application displays a second prompt for the terminal machine's portion of a modified dialogue sequence (e.g., series of prompts and corresponding user data entries), which is evidenced in the one or more prompts associated with, for example, editing or deleting the shopping list item (list) and the corresponding user data entry (e.g., selecting the corresponding button).  Additional prompts and associated data entries include, for example, without limitation, selecting search results and other associated prompts.  At least one of the first code, second code, and first updated code comprise

Java Byte code.  As explained above, the terminal application is identified as, for example, without limitation, the Defendant app for Android, and the first code is, for example, without limitation, the app's bytecode.  One of ordinary skill would understand this to comprise Java Byte code.

74.     On information and belief, Defendant manufactures, or contracts with vendors and others to manufacture, uses and distributes the Accused System, including the accused software applications running on the mobile devices and servers.  Within this jurisdiction and elsewhere, Defendant and its employees, agents and affiliates use the Accused System in connection with its design, development, testing and maintenance of the Accused System as well as in connection the use of the Accused System by its employees, agents, affiliates, and customers.

75.     On information and belief, Defendant further provides and distributes, or contracts with others to provide and distribute, the Defendant app of the Accused System, including the accused mobile applications.  Customers and/or end users download the Defendant app in accordance with Defendant's provided instructions.  As set forth above, the Defendant app interacts with Defendant's servers by communicating with and giving and/or receiving instructions, data, and other information to and from Defendant's servers.

76.     To the extent that some elements or steps of a claim in the '758 patent are performed or provided by a different party than Defendant, those elements or steps are attributable to the Defendant because Defendant participates in the infringement (as described above and herein) and receives a benefit upon use and performance of the claimed systems and methods of the '758 patent.  In particular, Defendant provides the software that establishes the manner and/or timing of the performance of the use of Defendant's software and thus directs and controls the actions that a user may request or the results from a user's actions.  Defendant receives a benefit from such actions by the customer as it allows the customer to shop and purchase Defendant's products from

Defendant and Defendant's customers receive a benefit in that they are able to shop and purchase Defendant's products remotely using their own devices.  Defendant's contracts with a user also create an agency relationship or governs infringing activity for purposes of joint infringement.

77.    On information and belief, Defendant instructs its customers and end users to download and install on end users' devices the infringing software applications, including updates, in order to use the claimed systems and practice the claimed methods of the '758 patent.  On information and belief, in accordance with Defendant's instructions, Defendant's customers and other end users use the Accused System in a way that practice the claimed methods of the '758 patent as set forth above.  The Defendant app issues computerized instructions to direct or control users, including Defendant's customers and other end users, in the manner or timing of their use of their devices and the Defendant app.  Through its software on Defendant's servers and embedded on users' devices, as well as its contractual relationships with users, Defendant thus directs and controls users and their devices to perform acts of infringement alleged above.

78.    On information and belief, Defendant enters into agreements with customers and/or end users and others and conditions their use of Defendant's infringing software and its functionality, including but not limited to the Defendant app, upon consent with Defendant's Terms and Conditions and Privacy Policies, within this jurisdiction and elsewhere.

79.    On information and belief, at least since the filing of the original complaint, Defendant has knowingly and actively induced the infringement of one or more of the '758 patent claims by, *inter alia*, marketing, promoting, and offering for use the Accused Instrumentalities, knowingly and intending that the use of such instrumentalities by Defendant customers and by users infringes the '758 patent.  For example, Defendant intends to induce such infringement by, among other things, promoting users to download and run the Defendant app knowing that the use

32

of its application on a user's portable device or smart phone in connection with supporting systems such as its server(s) infringes one or more claims of the '758 patent.

80.    On information and belief, at least since the filing of this Complaint, Defendant has contributed to the infringement of the '758 patent by, *inter alia*, marketing and promoting products and services.   Defendant has used and promoted within the United States the Accused Instrumentalities.   By virtue of incorporating the patented technology described above, the Accused Instrumentalities are not staple articles or commodities of commerce suitable for substantial non-infringing use and are known by Defendant to be especially made or especially adapted to the infringe the '758 patent.  As a result, Defendant's Accused Instrumentalities have been used by its customers and by users to infringe the '758 patent.  Defendant continues to engage in acts of contributory infringement of the '758 patent.

81.    By reason of the acts of Defendant alleged herein, S3G has suffered damage in an amount to be proved at trial.

82.    Defendant threatens to continue to engage in the acts complained of herein and, unless restrained and enjoined, will continue to do so, all to S3G's irreparable injury.  It would be difficult to ascertain the amount of compensation that would afford S3G adequate relief for such future and continuing acts, and a multiplicity of judicial proceedings would be required.  S3G does not have an adequate remedy at law to compensate it for the injuries threatened.

## JURY DEMAND

S3G demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, S3G prays for relief as follows:

A.    For an order finding that the Asserted Patents are valid and enforceable;

B.     For an order finding that Defendant has infringed the Asserted Patents directly, contributorily and/or by inducement, in violation of 35 U.S.C. § 271;

C.     For an order finding that Defendant's infringement is willful;

D.     For an order temporarily, preliminarily and permanently enjoining Defendant, its officers, directors, agents, servants, affiliates, employees, subsidiaries, divisions, branches, parents, attorneys, representatives, privies, and all others acting in concert or participation with any of them, from infringing the Asserted Patents directly, contributorily and/or by inducement, in violation of 35 U.S.C. § 271;

E.     For an order directing Defendant to file with the Court, and serve upon S3G's counsel, within thirty (30) days after entry of the order of injunction, a report setting forth the manner and form in which it has complied with the injunction;

F.     For an order awarding S3G general and/or specific damages adequate to compensate S3G for the infringement by Defendant, including a reasonable royalty and/or lost profits, in amounts to be fixed by the Court in accordance with proof, including enhanced and/or exemplary damages pursuant to 35 U.S.C. § 284, as appropriate, as well as all of the profits or gains of any kind made by Defendant from its acts of patent infringement;

G.     For an order awarding S3G pre-judgment interest and post-judgment interest at the maximum rate allowed by law;

H.     For an order requiring an accounting of the damages to which S3G is found to be entitled;

I.     For an order declaring this to be an exceptional case pursuant to 35 U.S.C. § 285 and awarding S3G its attorneys' fees;

J.     For an order awarding S3G its costs of court; and

      K.     For an order awarding S3G such other and further relief as the Court deems just and proper.

DATED:  February 22, 2024              Respectfully Submitted,


                                       By: */s/ Charles Ainsworth*
                                       Charles Ainsworth
                                       State Bar No.  00783521
                                       PARKER, BUNT & AINSWORTH, P.C.
                                       100 E. Ferguson, Suite 418
                                       Tyler, TX 75702
                                       903/531-3535
                                       E-mail: charley@pbatyler.com

71981903v1